AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>A 2022 BLACK NISSAN ARMADA, LOUISIANA<br>TEMPORARY LICENSE PLATE NO. 19967532,<br>VIN # JN8AY2BA2N9390136 | )<br>)<br>)<br>)<br>)<br>)  Case No. 23-MJ-51 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Middle_____ District of _____Louisiana_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) | Drug Trafficking Violations |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Briana Zuroske* Digitally signed by Briana Zuroske
Date: 2023.05.17 18:48:20 -05'00'

*Applicant's  signature*

Briana Zuroske, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: __May 17, 2023__

*Judge's signature*

City and state:  Baton Rouge, Louisiana            Scott D. Johnson, U.S. Magistrate Judge

*Printed name and title*

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

IN THE MATTER OF THE SEARCH    :
OF A 2022 BLACK NISSAN ARMADA,    :    23-MJ-51
LOUISIANA TEMPORARY LICENSE    :    **UNDER SEAL**
PLATE NO. 19967532,    :
VIN JN8AY2BA2N9390136    :

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Briana Zuroske, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Federal Rule of Criminal Procedure 41 for a warrant to search the following:

> The vehicle known as a 2022 black Nissan Armada, Louisiana Temporary License Plate No. 19967532, VIN JN8AY2BA2N9390136, hereinafter "the **SUBJECT VEHICLE**," further described in Attachment A, for the things described in Attachment B.

2.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so for five years. I am currently assigned to the FBI-New Orleans Field Office/Baton Rouge Resident Agency (RA), and I have been assigned there for almost two years. Prior to my assignment to the Baton Rouge RA, I was assigned to the FBI-Albuquerque Field Office/ Las Cruces RA. I am currently assigned to a violent crimes squad at the Baton Rouge RA, and I was assigned to a violent crimes squad previously at the Las Cruces RA. As a Special Agent, I have conducted investigations into violent crimes such as bank robberies, kidnappings, and firearm possession/use, among other investigations. As part of these investigations, I have conducted and participated in consensual monitoring and physical surveillance, the execution of search and arrest warrants, and debriefings of cooperating sources and witnesses. I am an investigative or law enforcement officer of the United

1

States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses against the United States enumerated in, but not limited to, Title 18 and Title 21 of the United States Code.

3.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation.

4.      The facts contained in this affidavit are those I believe sufficient to establish probable cause that evidence, fruits, instrumentalities, and contraband of criminal violations arising under Title 21, United States Code, Sections 846, Conspiracy to Possess with Intent to Distribute Controlled Substances, and 841(a)(1), Distribution and Possession with Intent to Distribute Controlled Substances ("the Target Offenses"), are in the **SUBJECT VEHICLE**.

## **PROBABLE CAUSE**

5.      Beginning in or about November 2022, agents began an investigation into **ROBERT PENNYWELL ("PENNYWELL")** related to his suspected possession and distribution of controlled substances with others known and unknown.[1]

---

[1] As indicated in paragraph 6, agents have relied upon, *inter alia*, confidential sources in this investigation. One such confidential source, CS-3 provided information pursuant to a proffer agreement with the government. CS-3 provided the information in hopes of receiving a benefit in their federal case. CS-3 was sentenced to twenty years of incarceration. Prior to sentencing, prosecutors filed a motion for downward departure pursuant to section 5K1 of the United States Sentencing Guidelines recommending a twenty-year sentence based, in part, on CS-3's assistance in the instant investigation. CS-3's advisory guideline range sentence prior to the downward departure motion was 262-327 months (approximately 22-27 years of incarceration). CS-3 has told agents that they began supplying controlled substances, including heroin, to **PENNYWELL** in approximately 2021. Information that CS-3 has provided during this investigation has been corroborated independently by me and other agents. Based upon my ability and that of other agents to corroborate information supplied by CS-3 independently, I deem information provided by them credible.

6.      Throughout the investigation, agents have relied upon multiple investigative tools, including grand jury subpoenas, pen registers/trap and trace devices, geolocation data warrants, surveillance, confidential sources, controlled narcotics purchases, and court-authorized interceptions of wire communications.

7.      On or about March 16, 2023, Chief United States District Judge Shelly D. Dick of the United States District Court for the Middle District of Louisiana signed an order authorizing the interception of wire communications occurring over TARGET TELEPHONE THREE, a cellular telephone assigned telephone number (225) 371-0522, which agents believed was being used by **PENNYWELL**. On or about April 18, 2023, United States District Judge Brian A. Jackson of the United States District Court for the Middle District of Louisiana singed an Order authorizing the renewal of interceptions over TARGET TELEPHONE THREE. Interception is currently ongoing.

8.      A warrant authorizing a tracking device on the **SUBJECT VEHICLE** was previously signed by United States Magistrate Judge Scott D. Johnson on April 6, 2023 in case number 23-MJ-32. The tracking device was installed on the **SUBJECT VEHICLE** on April 12, 2023 and was valid for thirty days The warrant was renewed for another thirty days on or about May 5, 2023, by United States Magistrate Judge Erin Wilder-Doomes in case number 23-MJ-48.

9.      As described more fully below, the investigation has revealed that **PENNYWELL** drives the **SUBJECT VEHICLE** to facilitate his drug trafficking.[2] There are multiple phone interceptions over TARGET TELEPHONE THREE in which drug customers ask **PENNYWELL** to travel and meet them to consummate drug sales. Additionally, global positioning system ("GPS")

---

[2] At the outset of this investigation, the **SUJBECT VEHICLE** was observed bearing a temporary license plate 144468 from the State of Ohio. Recently, the **SUBJECT VEHICLE,** was observed bearing Louisiana temporary license plate 19967532. I am aware that individuals engaged in criminal activity use temporary registration tags (a.k.a. "paper plates") to impede law enforcement's ability to identify them. Based on public database searches, I am aware that the "paper plates" on the **SUBJECT VEHICLE** do not come back to the **SUBJECT VEHICLE** or **PENNYWELL**.

tracking, intercepted calls, physical surveillance, and pole camera surveillance footage show **PENNYWELL** driving the **SUBJECT VEHICLE** from his residence at 2597 Brady Avenue, Zachary, Louisiana, at times when the intercepted calls show he was conducting drug sales. Similarly, there are multiple interceptions establishing that **PENNYWELL** uses Wireless Telephone Device(s) assigned the call number associated with TARGET TELEPHONE THREE to facilitate his drug trafficking business. I assert that surveillance combined with information learned over intercepted calls establishes probable cause to believe there will be evidence, fruits, instrumentalities, and contraband of **PENNYWELL's** criminal activity located within the **SUBJECT VEHICLE** and Wireless Telephone Device(s) found therein.

10.     Below are examples of pertinent conversations intercepted over TARGET TELEPHONE THREE involving **PENNYWELL** showing that he uses Wireless Telephone Device(s) and the **SUBJECT VEHICLE** in furtherance of the Target Offenses.

<u>Pertinent Intercepted Calls Establishing Probable Cause for the Search Warrant</u>

11.     On or about April 5, 2023, at 12:10 p.m., **PENNYWELL** received an incoming call from a telephone assigned call number (225) 439-4644, believed to be used by Samuel Ward ("WARD"), with the following content:

> **PENNYWELL**: What's up?
>
> WARD: Don't know, you?
>
> **PENNYWELL**: Uh hey what's up with your boy?
>
> WARD: He wants one unit, he is tight on money
>
> **PENNYWELL**: Say that again
>
> WARD: He just wants one of those things because he is tight on money.
>
> **PENNYWELL**: Alright. Tell him you can let him get that bitch for uh the six-way.
>
> WARD: How much it is?

**PENNYWELL**: 600

WARD: Alright now I need uhh, your boy was real light on our last little go right there it was 5.3 or something I took a picture for you. Uh but anyway. So and I didn't realize it's the holiday weekend.

**PENNYWELL**: Oh yeah yeah yeah I was supposed to tell you about that. Yeah I forgot all about that shit man.

WARD: That's a'ight. No problem.

**PENNYWELL**: He do owe us. That's what I had to tell you.

WARD: Ain't no problem. So it 6 on that 6 on that [*unintelligible*]

**PENNYWELL**: Hold on what did you say.

WARD: I was just thinkin' out loud. I need you why don't you pick up 2 units plus that 6 I mean that other business and then I'll get it all squared off.

**PENNYWELL**: A'ight you say the one for dude

WARD: Yup and two for me on my end

**PENNYWELL**: A'ight

WARD: I may be getting some more from you cuz I'm gonna be gone from tomorrow night or Friday mornin' 'til uh shit late on Sunday you know.

**PENNYWELL**: Alright, alright. I ain't gonna lie man I had bought me a couple Lortabs too them bitches was good [*unintelligible*]

WARD: That's because they are fuckin legit. You know what I'm sayin' we prolly both been taken bad shit for so long you ain't even know what good is no more.

**PENNYWELL**: That shit had me feelin' so good. I'm like man I ain't felt like this off a Lortab.

WARD: I know I'm the same way [*unintelligible*] laid back chill but uh yeah that dude he got a pocket of them things [*unintelligible*]

**PENNYWELL**: Yeah that's what [*unintelligible*]

WARD: Because if you know we know they legit. You know what I'm sayin'.

5

**PENNYWELL**: Yeah [*unintelligible*]

WARD: So I'd rather take a small one that I know is legit than something else that's bunk.

**PENNYWELL**: Bunk yeah that's the key

WARD: I can tell by the way it affects me not just when I take but it the next day. That's how I really know whether it's some bullshit or not.

**PENNYWELL**: Fo sho

WARD: I'm about to go in to lunch with my staff. I'm gonna be out of pocket. Imma be on government for a little bit. But yeah I'll be in the office [*unintelligible*]

**PENNYWELL**: Imma try to catch you at the office.

WARD: A'ight that sounds good.

**PENNYWELL**: Before you go across that water.

WARD: That's cool that's cool. Just let me know I got an appointment around 3:45 so I'll be around.

**PENNYWELL**: A'ight

WARD: A'ight big dog, holler at me if you need me.

**PENNYWELL**: Fo sho

12.    At the beginning of the call, **PENNYWELL** asked WARD about his "boy," to which WARD replied he wants one unit. WARD then asked how much, and **PENNYWELL** said "600," which I interpret to mean $600. I believe this interaction shows WARD attempting to facilitate a narcotics transaction with **PENNYWELL**. WARD then told **PENNYWELL**, "your boy was real light on our last little go right there it was 5.3 or something I took a picture for you." I believe that WARD told **PENNYWELL** that he was shorted on his last purchase, and that he took a picture to show **PENNYWELL** that WARD paid for more narcotics than he received. **PENNYWELL** confirmed WARD's statement when he said, "he do owe us."  WARD then provided **PENNYWELL** with his order when he said, "why don't you pick up 2 units plus that 6 I

6

mean that other business and then I'll get it all squared off." I believe that WARD proposed this quantity of narcotics for a new deal and to "square off" the prior deal which **PENNYWELL** agreed he was shorted by a supplier associated with **PENNYWELL** – referred to as "his boy." WARD and **PENNYWELL** then began to discuss Lortabs, commonly known as hydrocodone, a Schedule II narcotic. Then they returned to discussing their impending narcotic transaction. In that regard, **PENNYWELL** told WARD, "imma try to catch you at the office," which demonstrates that **PENNYWELL** most likely intends on using the **SUBJECT VEHICLE** to deliver narcotics to WARD. Later that evening, at approximately 7:31 p.m., WARD, from a telephone assigned call number (225) 439-4644, called **PENNYWELL** with the following content:

> **PENNYWELL**: Hello
>
> WARD: Hey, what's up?
>
> **PENNYWELL**: What's going, where you at?
>
> WARD: I'm at the house, but I'm good to go I believe, I'll grab my stuff, and I will take care of my end [*unintelligible*]
>
> **PENNYWELL**: [*Unintelligible*] cuz I'm about to uh, hey you want to put it in the mailbox?
>
> WARD: Where uh, what time are you gonna be here? If you, it depends on what time you're here, I like it when you pull down the driveway but uh
>
> **PENNYWELL**: Alright
>
> WARD: It's gotta be the right time though
>
> **PENNYWELL**: Alright
>
> WARD: What time you thinking?
>
> **PENNYWELL**: [*Unintelligible*] uh let me call, let me uh
>
> WARD: Just shoot me a text, I'm going to put my phone in my pocket so I should hit you back right away
>
> **PENNYWELL**: A'ight

WARD: A'ight

13.    I assert that during this call, **PENNYWELL** asked WARD where he was located to which WARD replied, "I'm at the house," which I believe refers to WARD's residence located at 2023 Fairview Avenue, Port Allen, Louisiana. WARD told **PENNYWELL** he is "good to go," which I interpret to mean WARD is available to meet with **PENNYWELL**

14.    At approximately 8:44 p.m., WARD, from a telephone assigned call number (225) 439-4644, called **PENNYWELL** back with the following content:

**PENNYWELL**: Hello

WARD: Hey, can you hear me?

**PENNYWELL**: Huh?

WARD: Can you hear me?

**PENNYWELL**: Yeah

WARD: Hey can you hear me?

**PENNYWELL**: Yeah

WARD: I said let me know when you're about 5 minutes out and then I'll figure where I'm gonna put it, in the mailbox or in my carport. But look I got you a little envelope ok, and in it they got some money, they got a couple of them blue things you like, and then they got a box alright, it's just a outside label of a box. And that's that pen thing I've been telling you about bro. And that ain't even a true vaporizer, that one just lights it in the pen. It's kinda like those vape pens, but it ain't a vape pen. It's the real deal, you put your flower in it. Uh so I just sent you

**PENNYWELL**: [*Unintelligible*]

WARD: Well you'll see it, the one I got right there, the one I got apparently they make 'em a little bit better than that now, now that's different. Now they make another thing dog that's called a vaporizer. The vaporizer is the same thing you put the flower in there and when you hit it, it doesn't even really smoke, it just turns into vapor. And it all, like for the first really, for the first two or three pulls all you taste is like what the flower supposed to taste like whatever kind it is.

**PENNYWELL**: Yeah

WARD: That's all you get out of it, its pure pure pure shit. So uh but the pen thing, I like that, I like the smoke I guess, I like to be able to see it whatever. But uh anyways

**PENNYWELL**: [*Unintelligible*]

WARD: Now look there's some cash in there and whenever you tell me the total I'm going to Venmo you the rest of it right now. Uh so just let me know.

**PENNYWELL**: How much cash in there now?

WARD: Uh I think 6

**PENNYWELL**: 6

WARD: Uh huh, 6 is yeah

**PENNYWELL**: It's 6 and 7, that's 11

WARD: Yeah, I got you.

**PENNYWELL**: No hold on is that 11?

WARD: No no no, brother that's 13

**PENNYWELL**: No, that's 13

WARD: That's what I just said

**PENNYWELL**: 13 yeah

WARD: I don't, hey, I don't fuck nobody that doesn't have it coming bro, I ain't ever gonna fuck you over

**PENNYWELL**: Yeah

WARD: So I'll hit you with that right away. If you come across any, if you got any new green on you, you always let me know, you just give me a little bit I like to try 'em all. And you ain't stopping by the gas station for nothing [*unintelligible*]. I'm trying to get everything huh

**PENNYWELL**: Hold on what you said about stopping by a gas station

WARD: Yeah I just didn't know if you were stopping by a gas station I need tobacco, but I ain't sweating you on that, fuck, trying to get [*unintelligible*] Good Friday and all that

9

**PENNYWELL**: Yeah

WARD: But if you stop somewhere holla at me. But uh give me a call or text or whatever on about the 5 minute warning, where are you right now I can time it up

**PENNYWELL**: I'm passing up uh, I'm passing up Chippewa on the Interstate

WARD: Alright you're close, 10-4, I'm gonna go check on my squeeze and then I'll let you know how we're gonna handle it

**PENNYWELL**: Said you're about to send it on Venmo?

WARD: Yeah, I will. Soon as I uh put this fuckin' box down, yeah, alright, I'll do that, but just know I need you to tell me when you're close yeah 5 minutes

**PENNYWELL**: [*Unintelligible*] pass RaceTrac

WARD: Yeah, that's perfect, perfect

15.    I believe that during this phone call, **PENNYWELL** used the **SUBJECT VEHICLE** to drive to WARD'S residence to deliver suspected narcotics. WARD advised **PENNYWELL** to let him know when **PENNYWELL** was close to his residence. WARD also advised **PENNYWELL** that he planned to pay in cash and via Venmo.[3] I believe when WARD said there is "6" in there now, he told **PENNYWELL** he has $600 in cash and planned to Venmo **PENNYWELL** the remaining $700, which he refers to as "7," for a total of "13," or $1,300. **PENNYWELL** gave WARD his location, saying he was at the Chippewa Street exit and the Interstate, which I believe is I-110. Prior to this call, surveillance units observed a dark-colored Nissan Armada, believed to be the **SUBJECT VEHICLE**, leave **PENNYWELL's** known address of 2597 Brady Avenue, Zachary, Louisiana, and head south toward Baton Rouge, Louisiana. Surveillance followed the **SUBJECT VEHICLE** to 2023 Fairview Avenue, Port Allen, Louisiana,

---

[3] I am aware that Venmo is a peer-to-peer payment application that is typically used on a mobile device and that there are other peer-to-peer payment applications that are used to facilitate both legal and, as here, illegal transactions.

where it pulled into the driveway. The **SUBJECT VEHICLE** stayed in the driveway for approximately one minute before leaving back toward Baton Rouge, Louisiana without making any stops along the way. Based on the call, in conjunction with surveillance, I believe **PENNYWELL** used the **SUBJECT VEHICLE** to deliver the narcotics to WARD at his residence and that **PENNYWELL** picked up drug proceeds left by WARD and transported them back to his residence in Zachary, Louisiana in the **SUBJECT VEHICLE**.

16.    I note that WARD clarified with **PENNYWELL** he was going to pay him the remainder of the balance on Venmo and that **PENNYWELL** did not object to this form of payment. I believe this shows that **PENNYWELL** and WARD have established Venmo as means for WARD to pay **PENNYWELL** for narcotic purchases.

17.    I believe that under the circumstances and knowing that drug distribution is a cash laden business and that Venmo and other applications are methods to transfer cash using a Wireless Telephone Device, there is probable cause to believe that any Wireless Telephone Device(s) found within the **SUBJECT VEHICLE** will contain Venmo or another peer-to-peer payment application that could be found upon a forensic examination of a Wireless Telephone Device. I assert that such information would constitute evidence of the Target Offenses and aid in furthering the instant investigation.

18.    On or April 14, 2023, at approximately 10:42 a.m., **PENNYWELL**, using TARGET TELEPHONE THREE, received an incoming call from a telephone assigned call number (225) 362-7258, believed to be used by Jhon Brooks, a.k.a. Poppadoc ("BROOKS"), which contained the following content:

> BROOKS: What's happening with ya, good morning, man.
>
> **PENNYWELL**: What's up man?
>
> BROOKS: Shit, cooling.

11

**PENNYWELL**: What side of town you on?

BROOKS: Well, I'm like on Essen.

BROOKS: Yeah, shit, I'm about to come back up there way tho, I got, I gotta go up there any ways, you know what I'm saying [*unintelligible*]

**PENNYWELL**: Alright, well shit, I need to get a seven from you.

BROOKS: Alright, shit once I get um ... close back up there towards Baker and shit I'll call you. You go up that way?

**PENNYWELL**: Yeah. BROOKS: Alright, I'm about to be heading there in few minutes and I'll call you when I'm up there.

19.    During this conversation when **PENNYWELL** told BROOKS, "I need to get a seven from you," I believe **PENNYWELL** requested seven grams of suspected narcotics from BROOKS. Next, they discussed their respective locations, so they can figure out where to meet. I believe **PENNYWELL** and BROOKS settled on meeting in the Baker, Louisiana area, when BROOKS told **PENNYWELL**, "once I get um ... close back up there towards Baker and shit I'll call you," **PENNYWELL** agreed.

20.    Later that afternoon, at approximately 12:22 p.m., BROOKS, from a telephone assigned call number (225) 362-7258, called **PENNYWELL** with the following content:

**PENNYWELL**: I'm on 61, we can go ahead and [*unintelligible*] on 61.

BROOKS: [*Unintelligible*] on 61 though, I'm just saying.

**PENNYWELL**: Uh ... you know where uh ... um ... what this called? I'm passing I'm passing you know where where how you get to Baker ... I'm passing the Baker ... what dat is? Blount? No that's uh ... What is that? You know when you coming up 61 and and ... You know where that Texaco?

BROOKS: Yeah.

**PENNYWELL**: By the, by the jail?

BROOKS: Oh shit, you on inside? So, you on ... that's 19 then, [*unintelligible*] Scenic Highway is 61.

12

**PENNYWELL**: That's nine?

BROOKS: That gotta be I think, 60, 67 or whatever that is, shit, I think. I gotta go back this way.

**PENNYWELL**: You got an iPhone?

BROOKS: No, I ain't got no iPhone. I got a motherfucking Android, but I know where that Texaco at, you be like where that, that city train and all that shit is.

**PENNYWELL**: City Train? I don't think they got no city train.

BROOKS: Oh, they don't?

**PENNYWELL**: No, they ain't got no city train. Man I'm [*unintelligible*] I'm like I'm I'm literally.

BROOKS: I'm on Blount Road, here it is 61, I'm tripping [*unintelligible*] you by that cat scale, they got that truck stop.

**PENNYWELL**: Yeah, I'm com ... I'm about to come right there.

BROOKS: I need to turn around and go there then. Let me turn this motherfucking back around.

**PENNYWELL**: My bad man, I'll give you extra uh 25 or something bruh.

BROOKS: It's all good, I ain't even really tripping. I just couldn't be sitting right there that motherfucking law man, you know what I'm saying shit.

**PENNYWELL**: Them bitches bad; them bitches is bad over there.

BROOKS: [*Unintelligible*] motorcycle law. I don't know that n**** might [*unintelligible*] trying to make some traffic shit or something though you know ... over with.

**PENNYWELL**: [*Unintelligible***]** ain't even trying to see them.

BROOKS: Yeah, I ain't even trying to see them bitches period, you right.

**PENNYWELL**: Mmm I feel you.

BROOKS: Yeah, well I'm turning onto on there Scenic Highway right now then so shit. I just come up go up then.

13

**PENNYWELL**: Alright, I'm coming up to this bitch right, I'm coming up to that motherfucker right now, so we should bump heads.

BROOKS: Alright that's cool then. I just call in a second as long as I don't go up like I'm going up St. Natchez or whatever that shit is, you know how you going up.

**PENNYWELL**: Yeah, I know what you talking about.

BROOKS: Yeah [*Unintelligible*]. Shit I'm coming up to that bitch nah, so where you want me to start like go to?

**PENNYWELL**: You want to go to that, the truck stop?

BROOKS: Yeah, I mean, yeah, I can go there. Shit. Yeah, I'll go there.

**PENNYWELL:** Alright [*unintelligible*] truck stop.

BROOKS: The Chevron right?

**PENNYWELL**: Yeah the Chevron.

BROOKS: Yeah I'm about to coming up there to that motherfucker now.

**PENNYWELL**: I'm coming ... I'm coming through this curve right now. Man, I don't know where the fuck [*unintelligible*]

BROOKS: [*Unintelligible*] I'm over here by that Chevron [unintelligible] walk in that bit.

**PENNYWELL**: Alright.

BROOKS: Alright.

21.    I assert that during this phone call with BROOKS, **PENNYWELL** coordinated to meet at the Chevron gas station located at 111 Thomas Road, Baton Rouge, Louisiana, to complete a drug transaction. Additionally, I believe **PENNYWELL** offered to pay BROOKS an additional $25 for the purchase of suspected narcotics because he inconvenienced him in trying to find a location to conduct the exchange. I assert that this is evident when **PENNYWELL** said to BROOKS, "My bad man, I'll give you extra uh 25 or something bruh." Investigators conducting surveillance at the above-mentioned Chevron observed a silver in color Chevy Silverado registered

14

to BROOKS. Soon after, investigators observed **PENNYWELL** arrive at the Chevron in the **SUBJECT VEHICLE** and park next to BROOKS' Silverado. Investigators observed **PENNYWELL** get out of the **SUBJECT VEHICLE** and approach the Silverado, at which time the individual in the Silverado opened the door and **PENNYWELL** appeared to take something from the individual and place it in the **SUBJECT VEHICLE**. Minutes later **PENNYWELL** was seen leaving the area driving the **SUBJECT VEHICLE**. Additionally, GPS tracker records show the **SUBJECT VEHICLE** at the Chevron at approximately the same time and date that investigators observed **PENNYWELL** arrive.

22.    I believe that the object **PENNYWELL** took from the individual inside of the Silverado, believed to be BROOKS, was narcotics based upon the two prior calls between **PENNYWELL** and BROOKS. I further believe that **PENNYWELL** used the **SUBJECT VEHICLE** to drive to the Chevron to pick up the narcotics and subsequently to transport those narcotics in the **SUBJECT VEHICLE**.

23.    On or about April 29, 2023, at approximately 2:22 p.m. **PENNYWELL** received an incoming call from a telephone assigned call number (225) 439-4644, believed to be WARD, with the following content:

> **PENNYWELL**: Hello.
>
> WARD: Hey you left town yet or what?
>
> **PENNYWELL**: Man, I had uh I'm about to cross the bridge I'm on my way to your spot right now.
>
> WARD: Alright, uh, make it quick I'm at the house I just got here, but I got [*unintelligible*] and my wife will be home any minute. So, just blow in and uh I'll put a bucket or something right here under the car port and throw it in there and then I'll, tell me what I owe you, yeah but I mean just like I said. Just pull up, hit it and get it. Just make sure nobody lays eyes on it, if they just came stumbling by. Uh, but I'm gonna sneak it, I'm going to open a bucket up right there by the car.
>
> **PENNYWELL**: Alright

15

WARD: Uh, alright. Do that and uh.

**PENNYWELL**: Alright I'm uh call you when I'm close

WARD: Yeah yeah do that.

**PENNYWELL**: Alright.

WARD: Alright bud, appreciate it.

24.     In this call, I believe WARD contacted **PENNYWELL** to discuss his narcotics order. WARD asked, "Have you left town yet," to which **PENNYWELL** responded, "I'm about to cross the bridge," indicating that he was crossing the Mississippi River towards WARD's residence located at 2023 Fairview in Port Allen, Louisiana. I believe when WARD informed **PENNYWELL**, "just blow in and uh, I'll put a bucket or something right here under the car port," "tell me what I owe you," and "make sure nobody lays eyes on it," WARD instructed **PENNYWELL** to deliver the narcotics in a clandestine manner. He further instructed **PENNYWELL** to tell him the cost of the drugs after making the delivery. I believe WARD wanted **PENNYWELL** not to delay leaving his residence by discussing the money owed. Further, I assert that WARD appeared to attempt to hide his narcotics purchase and association with **PENNYWELL** from his wife and others because it is illegal. **PENNYWELL** told WARD, "I'm uh call you when I'm close," indicating that he will notify WARD before he makes the delivery. Additionally, agents conducting surveillance via pole camera observed the **SUBJECT VEHICLE** leave **PENNYWELL's** residence at approximately 2:18 p.m., minutes before WARD called him. GPS tracker location information indicated that the **SUBJECT VEHICLE** left **PENNYWELL's** residence at approximately the same time and traveled south, then west bound towards WARD's residence.

25.     Later that day, at approximately 2:55 p.m., **PENNYWELL** called WARD at (225) 439-4644 with the following content:

**PENNYWELL**: Hey, what you want me to do?

WARD: A'ight, what ya got, I'm sorry, I couldn't hear a damn thing.

**PENNYWELL**: What you want me to do? Pull in [*unintelligible*].

WARD: Yeah, yeah pull in pull in pull in.

**PENNYWELL**: Thought you said your wife was there.

WARD: No she's not. Not yet, but any minute she she should be back. [*unintelligible*] my little boy right now. They got a bucket out there. You shoot me the bill once you go on.

**PENNYWELL**: The white bucket?

WARD: Yeah, you see it?

**PENNYWELL**: Yes

WARD: Alright, hit me up in a little minute. I'm about to walk back outside in a little bit. I said hit me back in a little bit and shoot me a total on it.

**PENNYWELL**: Alright.

WARD: Alright.

26.     I believe that **PENNYWELL** asked WARD for further instructions on how he wanted him to deliver the narcotics once he arrived at WARD's house in the **SUBJECT VEHICLE**. To that end, **PENNYWELL** asked, "what do you want me to do … pull in?" WARD replied with "yeah pull in," and "they got a bucket out there." Here, I believe WARD instructed **PENNYWELL** to pull into the driveway of his residence and place the narcotics into a bucket, which WARD placed there previously for this purpose. **PENNYWELL** then clarified the color of the bucket, asking, "the white bucket?" WARD answered, "yeah." Lastly, WARD told **PENNYWELL**, "hit me back in a little bit, and shoot me a total on it," indicating that he asked **PENNYWELL** to tell him the price of the narcotics so that WARD could pay **PENNYWELL**. I believe WARD wanted **PENNYWELL** to tell him after he delivered and left his house to avoid him staying on his property longer than necessary to drop the drugs off. GPS tracker records showed

17

that the **SUBJECT VEHICLE** was in close proximity to WARD's residence at the time of this conversation.

27.     On or about May 11, 2023, at approximately 10:14 p.m., **PENNYWELL** made an outgoing call to a telephone assigned call number (225) 362-7258, believed to be BROOKS, with the following content:

>   BROOKS: [*unintelligible*]
>
>   **PENNYWELL**: What up
>
>   BROOKS: [*unintelligible*]
>
>   **PENNYWELL**: Chillin' uh
>
>   BROOKS: I'm glad you called today you you pullin' off [*unintelligible*] I turn back around and go grab that shit
>
>   **PENNYWELL**: Uh uh oh look look I didn't even tell you what I want. I needed a basketball. I need one ball. I need one ball.
>
>   BROOKS: Alright Imma [*unintelligible*]
>
>   **PENNYWELL**: My bad. I ain't even seen my phone bro my bad. Uh what uh you going back toward Baker way?
>
>   BROOKS: No [*unintelligible*] on the other end like you know like [*unintelligible*] side and shit. [*unintelligible*] Valley Park right now though
>
>   **PENNYWELL**: Alright. What end I gotta come on
>
>   BROOKS: Uh Chippewa would be good
>
>   **PENNYWELL**: Alright well look I'm uh Imma jump in the shower right now
>
>   BROOKS: Alright just call I'll be out and about just hit me up
>
>   **PENNYWELL**: Alright
>
>   BROOKS: Alright

28.     In this call, I believe **PENNYWELL** contacted BROOKS to purchase drugs from BROOKS. Specifically, **PENNYWELL** asked BROOKS for a "ball," which I believe is approximately an eighth of an ounce of an unknown drug. I assert that BROOKS and **PENNYWELL** then discuss where they can meet up to complete the drug transaction. I aver that

BROOKS told **PENNYWELL** to meet him off Chippewa Street, which I know is a street in Baton Rouge, Louisiana with an exit off of Interstates I-110. I assert that **PENNYWELL** confirmed this meeting location and said he was going to take a shower and then will contact BROOKS.

29.     The same day, at approximately 10:38 p.m., **PENNYWELL** made an outgoing call again to (225) 362-7258, believed to be BROOKS, with the following content:

> BROOKS: Hello
>
> **PENNYWELL**: What up
>
> BROOKS: Oh [*unintelligible*]
>
> **PENNYWELL**: I'm bustin' out I'm uh leavin' out my neighborhood right now
>
> BROOKS: Alright shit we should probably be there by the same time [*unintelligible*] on Chippewa but I'm getting off uh College now. I ain't finna be prolly about two, three minutes out there in the Valley [*unintelligible*] meet you there by the time you get there I uh you know we prolly be meeting up you coming from out that way
>
> **PENNYWELL**: Yeah
>
> BROOKS: Yeah we should meetin' up around the same time
>
> **PENNYWELL**: Alright bet
>
> BROOKS: Alright

30.     Based on this call, I believe **PENNYWELL** and BROOKS were notifying each other they were each heading toward Chippewa Street, the agreed upon location for **PENNYWELL** to purchase drugs from BROOKS. Geolocation information for a tracker previously installed on the **SUBJECT VEHICLE** showed the **SUBJECT VEHICLE** leave 2597 Brady Avenue, Zachary, Louisiana, which is **PENNYWELL's** known residential address, at approximately 10:38 p.m. Per geolocation data, the **SUBJECT VEHICLE** arrived at the area of 3576 Chippewa Street, Baton Rouge, Louisiana at approximately 11:04 p.m., an area previously associated with BROOKS based on surveillance. I believe **PENNYWELL** drove the **SUBJECT VEHICLE** to BROOKS' residence to pick up a "ball" of a suspected drug as the two had discussed earlier that evening.

19

31.    Based on the phone interceptions, GPS tracker location data, and physical surveillance, I believe that **PENNYWELL** has used and is using the **SUBJECT VEHICLE** to transport narcotics and proceeds from drug sales.

### WIRELESS TELEPHONE DEVICES LOCATED WITHIN THE SUBJECT VEHICLE

32.    Based on the probable cause set forth above and the interceptions monitored over TARGET TELEPHONE THREE, I also request that if any Wireless Telephone Device(s) (hereinafter "Device(s)") are located within the **SUBJECT VEHICLE**, that this search warrant authorize the seizure of such Device(s). As shown above, **PENNYWELL** utilizes Device(s) assigned the call number associated with TARGET TELEPHONE THREE to coordinate the Target Offenses, and as such, I believe evidence of such will be located on Device(s) within the **SUBJECT VEHICLE**.[4]

### MANNER OF EXECUTION

33.    Your affiant requests authority to execute the search warrant on the **SUBJECT VEHICLE** any time day or night. As noted in paragraph 27-30, on May 11, 2023, **PENNYWELL** was believed to have used the **SUBJECT VEHICLE** to transport narcotics after 10:00p.m. On April 12, 2023, geolocation information for the **SUBJECT VEHICLE** showed it to be at WARD's house after 10:00p.m. Therefore, your affiant believes evidence of the Target Offenses will be located within the SUBJECT VEHICLE not just between the hours of 6:00am and 10:00p.m.

---

[4] Through my training and experience, I have learned that a subscriber identity module known as a SIM card stores identification information such as a phone number that if placed in a different Wireless Telephone Device can transfer a user's phone number and other information such as text messages to a specific mobile network. For example, a user could take a SIM card from a particular wireless telephone device, transfer for it to a new wireless telephone device, and continue using both the phone number and specific mobile network to which that phone number is assigned, but use multiple wireless telephone devices.

**CONCLUSION**

34.      In sum, I assert that the **SUBJECT VEHICLE** is used to transport controlled substances purchased and sold in narcotics transactions (i.e. to facilitate the Target Offenses). Based on these facts, I believe probable cause exists showing **PENNYWELL** presently utilizes the **SUBJECT VEHICLE** to facilitate the distribution of and possession with intent to distribute narcotics. I further believe that Wireless Telephone Device(s) found within the **SUBJECT VEHICLE** are being used to facilitate the Target Offenses.

35.      Based on the above information, I respectfully submit that there is probable cause to believe that narcotics offenses, in violation of Title 21, United States Code, Sections 846, Conspiracy to Possess with Intent to Distribute Controlled Substances, and 841(a)(1), Distribution and Possession with Intent to Distribute Controlled Substances, have been committed, and that evidence, fruits, instrumentalities, and contraband relating to this criminal conduct, as further described in Attachment B, will be found in the **SUBJECT VEHICLE**, as further described in Attachment A.

**REQUEST FOR SEALING**

36.      It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organization as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other criminals as they deem appropriate, i.e., post them publicly online through forums or on social media accounts. Premature disclosure of the contents of this affidavit

and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

                              Respectfully submitted,

                              Briana Zuroske   Digitally signed by Briana
                                               Zuroske
                                               Date: 2023.05.17 18:48:42 -05'00'
                              _____
                              Briana Zuroske
                              Special Agent, FBI


        Affidavit submitted by email/.pdf and attested to me as true and accurate by telephone

consistent with Federal Rules of Criminal Procedure 4.1 and 41(d)(3) on May __17___, 2023.

                              _____
                              SCOTT D. JOHNSON, MAGISTRATE JUDGE
                              UNITED STATES DISTRIC COURT
                              MIDDLE DISTRICT OF LOUISIANA

## ATTACHMENT A

### Property to Be Searched

1.  The vehicle is a 2022 black Nissan Armada, Louisiana Temporary License Plate Number 19967532, VIN JN8AY2BA2N9390136 ("**SUBJECT VEHICLE**").

2.  A picture of the **SUBJECT VEHICLE** is provided below:



## ATTACHMENT B

### Property to be Seized

Items to be searched for and seized include any evidence, fruits, instrumentalities, and contraband of violations of Title 21, United States Code, Sections 846, Conspiracy to Possess with Intent to Distribute Controlled Substances, and 841(a)(1), Distribution and Possession with Intent to Distribute Controlled Substances, from January 2021 to the present, including the following:

1. Controlled substances, including cocaine, fentanyl, heroin, scheduled prescription pills, and others not yet known.

2. Items used to package, process, dilute, weigh, and distribute controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices.

3. Paraphernalia for packaging and counting drug proceeds (cash), including heat sealing devices, plastic packaging for cash, rubber bands, and counting devices.

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of and/or possession with intent to distribute controlled substances (often referred to as ledgers).

5. Books, records, receipts, notes, ledgers, money orders, wire transfer or money remittance records, and other records related to the receipt, expenditure, and concealment or other disposition of income and/or proceeds from the distribution of controlled substances.

6. Cash, currency, financial instruments, and records relating to income from the distribution of controlled substances and expenditures of the proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking activities.

7. Records reflecting names, nicknames, addresses, and telephone numbers of both current and past drug associates, customers, and/or co-conspirators.

8. Safes, safety deposit boxes, keys for safety deposit boxes, hidden compartments and other secure locations, which often contain the proceeds of drug trafficking activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

9. Registration, insurance, rental agreements, and any other documents indicating who the primary operator of the vehicle is.

10. Seizure of Wireless Telephone Device(s) within the **SUBJECT VEHICLE**.

24

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means                ❒ Original            ❒ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| A 2022 BLACK NISSAN ARMADA, LOUISIANA | ) |
| TEMPORARY LICENSE PLATE NO. 19967532, | ) |
| VIN # JN8AY2BA2N9390136 | ) |

Case No.  23-MJ-51

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Middle_____ District of _____Louisiana_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before ____May 30, 2023,____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Scott D. Johnson_____.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*    ❒ until, the facts justifying, the later specific date of _____.

Date and time issued:  ____May 17, 2023, at 7:13 p.m.____        _____
*Judge's signature*

City and state:  ____Baton Rouge, Louisiana____        ____Scott D. Johnson, U.S. Magistrate Judge____
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br> 23-MJ- 51 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|         I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date:  _____<br><br><br><br>         _____<br>                                           *Executing officer's signature*<br><br>         _____<br>                                           *Printed name and title* |

## <u>ATTACHMENT A</u>

### Property to Be Searched

1.  The vehicle is a 2022 black Nissan Armada, Louisiana Temporary License Plate Number 19967532, VIN JN8AY2BA2N9390136 ("**SUBJECT VEHICLE**").

2.  A picture of the **SUBJECT VEHICLE** is provided below:



## ATTACHMENT B

### Property to be Seized

Items to be searched for and seized include any evidence, fruits, instrumentalities, and contraband of violations of Title 21, United States Code, Sections 846, Conspiracy to Possess with Intent to Distribute Controlled Substances, and 841(a)(1), Distribution and Possession with Intent to Distribute Controlled Substances, from January 2021 to the present, including the following:

1. Controlled substances, including cocaine, fentanyl, heroin, scheduled prescription pills, and others not yet known.

2. Items used to package, process, dilute, weigh, and distribute controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices.

3. Paraphernalia for packaging and counting drug proceeds (cash), including heat sealing devices, plastic packaging for cash, rubber bands, and counting devices.

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of and/or possession with intent to distribute controlled substances (often referred to as ledgers).

5. Books, records, receipts, notes, ledgers, money orders, wire transfer or money remittance records, and other records related to the receipt, expenditure, and concealment or other disposition of income and/or proceeds from the distribution of controlled substances.

6. Cash, currency, financial instruments, and records relating to income from the distribution of controlled substances and expenditures of the proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking activities.

7. Records reflecting names, nicknames, addresses, and telephone numbers of both current and past drug associates, customers, and/or co-conspirators.

8. Safes, safety deposit boxes, keys for safety deposit boxes, hidden compartments and other secure locations, which often contain the proceeds of drug trafficking activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

9. Registration, insurance, rental agreements, and any other documents indicating who the primary operator of the vehicle is.

10. Seizure of Wireless Telephone Device(s) within the **SUBJECT VEHICLE**.